```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/19/11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----

*In re*

FAIRPOINT COMMUNICATIONS, INC.,
*et al.*,

　　　　　　　　　　Debtors.

11 Civ. 946 (CM)

----

# DECISION AND ODER AFFIRMING THE BANKRTUPCY COURT'S CONFIRMATION ORDER APPROVING FAIRPOINT'S THIRD AMENDED JOINT PLAN OF REORGANIZATION

McMahon, J.:

　　　　Appellant Verizon Communications, Inc. ("Verizon" or "Appellant") appeals from the Confirmation Order of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) entered in the chapter 11 case of FairPoint Communications, Inc. ("FairPoint"). (Bankr. Docket No. 2013.) FairPoint's Third Amended Joint Plan of Reorganization (the "Plan") includes a provision that effectively enjoins Verizon from pursuing non-derivative claims against third parties where the assets of FairPoint or Reorganized FairPoint would be adversely affected. (Bankr. Docket No. 2013.) Verizon appeals from this Confirmation Order, arguing that the bankruptcy court does not have subject matter jurisdiction to enjoin them from pursuing non-derivative claims against third-parties, even if the claims affect the bankruptcy estate.

　　　　In response to this appeal, FairPoint filed a Motion to Dismiss the Appeal on the basis of equitable mootness, on the ground that Verizon had failed to stay the Confirmation Order and the Plan has been substantially consummated.  This motion was denied, because the appeal raises the

1

issue of the bankruptcy court's subject matter jurisdiction, which cannot be waived. (Docket Nos. 12; 13.)

FairPoint subsequently filed a Motion for Reconsideration. The holding here makes that motion moot.

Applying the Second Circuit's holding in In re Johns-Manville Corp., 517 F.3d 52 (2008) ("Manville III"), rev'd on other grounds, 129 S. Ct. 2195 (2009), I conclude that the bankruptcy court did have subject matter jurisdiction to enjoin Appellant from pursuing non-derivative claims that directly affect FairPoint's bankruptcy estate.

Alternatively, Verizon argues that the injunction is improper, because the factual prerequisite to the third party injunction, unique circumstances, was lacking. This argument is equitably moot, because the Plan has been substantially consummated and Verizon waived its right to object by not obtaining a stay of the Confirmation Order.

## FACTS AND PROCEDURAL HISTORY

In March 2008, FairPoint Communications, Inc. and its affiliated reorganized debtors (collectively, "FairPoint") acquired from Verizon Communications, Inc. ("Verizon") certain landline communications operations in Maine, New Hampshire, and Vermont. The transaction created $2.5 billion of debt that FairPoint was unable to service.

On October 26, 2009, FairPoint voluntarily petitioned under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Approximately $2 billion of FairPoint's debt was owed to secured lenders, for whom Bank of America, N.A. serves as the administrative agent. The United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "Creditors' Committee") as the statutory fiduciary

2

representing the interest of FairPoint's unsecured creditors on November 10, 2009. The Creditors' Committee also represents the unsecured noteholders, who hold approximately $550 million in claims against FairPoint.

On March 11, 2010, Judge Lifland approved FairPoint's Second Amended Disclosure Statement (the "Disclosure Statement"), (Bankr. Docket No. 825), which permitted creditors to vote on FairPoint's proposed Second Amended Joint Plan for Reorganization, (Bankr. Docket No. 811). The Disclosure Statement noted that the Creditors' Committee believed that the spinoff transaction gave rise to "material fraudulent transfer claims against Verizon and others" and provided that the Creditors' Committee was seeking to prosecute these claims for the benefit of creditors. (Disclosure Statement 37.) The creditors approved the Second Amended Plan on May 4, 2010. (Bankr. Docket No. 1271.)

On May 8, 2010, FairPoint filed its Modified Second Amended Plan, which provided for the establishment of a Litigation Trust. (Bankr. Docket No. 1312.) On May 10, 2010, FairPoint filed the Litigation Trust Agreement ("LTA"), assigning claims relating to the spinoff transaction to the Litigation Trust. The LTA includes a provision enjoining "Litigation Trust Defendants" from pursuing certain claims against third parties. FairPoint acknowledges that Verizon is the only party against whom the Litigation Trust intends to bring claims. For that reason, the injunction is hereinafter referred to as the "Verizon Injunction."

The purpose of the Verizon Injunction is to prevent FairPoint or Reorganized FairPoint from "incur[ring] liability with respect to Litigation Trust Claims in the nature of contribution, reimbursement or indemnification,. . . in connection with, arising out of or in any way related to the Litigation Trust Claims. . . ." (LTA § 1.8.) The injunction reads as follows:

> Any Person against whom a Litigation Trust Claim has been brought (a

3

> "***Litigation Trust Defendant***") shall be permanently barred, enjoined and restrained from commencing, prosecuting or asserting any Claim for contribution, reimbursement or indemnification or any Claim related thereto (a "***Covered Claim***") based upon, related to, or arising out of the prosecution of Litigation Trust Claims against that Litigation Trust Defendant, whether such Covered Claim is asserted in a court, an arbitration, an administrative agency or forum, or in any other manner, if the Covered Claim against a third party would, in turn, give rise to a [claim that will be paid in full] under the Plan against [FairPoint or Reorganized FairPoint]; *provided, however*, that the Litigation Trust shall reduce and credit against any judgment it may obtain against the Litigation Trust Defendant the amount of any Covered Claim which is determined by a court of competent jurisdiction in any action involving the prosecution of Litigation Trust Claims against that Litigation Trust Defendant. (LTA § 1.8(a).)

The same day, Verizon filed an objection, asserting that the injunction was improper. (Bankr. Docket No. 1345.)

An initial confirmation hearing was held on May 11, 2010; however, FairPoint had not yet obtained the regulatory approvals necessary to emerge from bankruptcy, so the hearing was adjourned before Judge Lifland heard argument regarding the Verizon Injunction.

On December 29, 2010, FairPoint filed Debtors' Third Amended Plan of Reorganization (the "Plan"), which incorporated the Litigation Trust and Verizon Injunction. (Bankr. Docket No. 2013.)

On January 13, 2011, after all regulatory approvals were obtained, the Bankruptcy Court resumed the confirmation hearing. At the hearing, Verizon had the opportunity to question witnesses concerning the necessity of the Verizon Injunction to FairPoint's creditors when voting for the Plan. Mr. Ajay Sabherwal, FairPoint's Chief Financial Officer, testified that the establishment of the Litigation Trust and the Verizon Injunction were critical to FairPoint's Reorganization. (Hr'g Tr. 26, Bankr. Docket No. 2169.) Mr. Christ Post of Bank of America, the agent who voted for the Second Plan of Reorganization, testified that both the litigation trust and the injunction "were a key tenet of our negotiation and agreement from the beginning." Mr.

Post also testified that Bank of America had been a party to another plan support agreement, which had expired in July 2010, and which included the establishment of the litigation trust. Id. at 60.

At the close of the hearing, Judge Lifland concluded that the Bankruptcy Court had jurisdiction to enjoin Verizon from filing non-derivative third party actions that would affect FairPoint's assets. Id. at 81. He also concluded that the injunction was "essential to the debtors' reorganization and in the best interest of the estate under the standards set forth in Metromedia...." Id. at 82.

The next day, January 14, 2011, Verizon filed a Notice of Appeal to this Court. It did not seek a stay of the Confirmation Order. It also did not immediately ask to expedite the appeal. (Bankr. Docket No. 2121.)

On January 24, 2011, the FairPoint Plan became effective. (Bankr. Docket No. 2149.) Since that date, the following actions have been taken by Reorganized FairPoint:

  a. All assets and property vested in the Reorganized Debtors, free and clear of all liens and encumbrances, subject to certain explicit exceptions;

  b. Issuance of over 26 million shares of common stock in reorganized FairPoint Communications, Inc. (the "New Common Stock"). The New Common Stock began publicly trading on the NASDAQ on January 25, 2011 under the ticker symbol "FRP";

  c. Retention of The Bank of New York Mellon (operating with the service name BNY Mellon Shareowner Services) as transfer agent and registrar for the New Common Stock, and establishment of an investor relations operation with respect to the New Common Stock;

  d. Entry into a Warrant Agreement (the "Warrant Agreement") with The Bank of New York Mellon, as warrant agent, pursuant to which FairPoint has issued 3,458,390 warrants (the "Warrants") to purchase shares of New Common Stock;

  e. Cancellation of all equity interests outstanding prior to the Effective Date (the "Old Equity"), including, but not limited to, all of the approximately 89 million outstanding shares of the old common stock of FairPoint Communications, Inc., options, and contractual or other rights to acquire any equity interests;

f.  Adoption of fresh start accounting in accordance with the Reorganizations Topic of the Financial Accounting Standards Board Accounting Standards Codification, resulting in FairPoint Communications, Inc. becoming a new entity for financial reporting purposes;

g.  Execution of a $1.075 billion senior secured credit facility with a syndicate of lenders and Bank of America, N.A., as administrative agent (the "Exit Credit Facility"), which includes a $1 billion term loan facility and a $75 million revolving loan facility (the "Exit Revolver");

h.  Payment of a $1.5 million fee to the lenders providing the Exit Revolver;

i.  Termination of the pre-petition Credit Agreement, dated as of March 31, 2008, by and among FairPoint Communications, Inc., Northern New England Spinco Inc., Bank of America, N.A, as syndication agent, Morgan Stanley Senior Funding, Inc. and Deutsche Bank Securities Inc., as co-documentation agents, and Lehman Commercial Paper Inc., as administrative agent, and the lenders party thereto (the "Pre-Petition Credit Facility"), and all notes, swap agreements, UCCs, and other agreements associated therewith;

j.  Cancellation of all outstanding obligations, which totaled approximately $550 million, under the following notes (collectively, the "Pre-Petition Notes") and the indentures governing such obligations: (i) 13-1/8% Senior Notes due April 1, 2018, which were issued pursuant to the Indenture, dated as of March 31, 2008, by and between Northern New England Spinco Inc. and U.S. Bank National Association, as amended; and (ii) 13-1/8% Senior Notes due April 2, 2018, which were issued pursuant to the Indenture, dated as of July 29, 2009, by and between FairPoint Communications, Inc. and U.S. Bank National Association;

k.  Termination of the Debtor-in-Possession Credit Agreement, dated as of October 27, 2009, by and among FairPoint Communications, Inc., FairPoint Logistics, Inc., lenders party thereto, and Bank of America, N.A., as administrative agent (the "DIP Financing");

l.  Numerous filings with the Securities and Exchange Commission, including reports on Form 8-K regarding, *inter alia,* issuance of the New Common Stock and Warrants, cancellation of the Old Equity, cancellation of the Pre-Petition Notes, entry into the Exit Credit Facility, and termination of the Pre-Petition Credit Facility and the DIP Facility;

m.  As of February 16, 2011, distribution of over $12.3 million since the Effective Date in cash to creditors on account of allowed claims, with additional cash disbursements being made on an approximate weekly basis;

6

n.  Assumption of the amended collective bargaining agreements with International Brotherhood of Electrical Workers, AFL-CIO Locals 2320, 2326, and 2327 and Communications Workers of America, AFL-CIO (the "Collective Bargaining Agreements");

o.  Effectuation of the settlements with public utilities/services regulators in Maine, New Hampshire, and Vermont (the "Regulatory Settlements");

p.  Assumption of over 6,900 contracts;

q.  Rejection of over 100 contracts;

r.  Discharge of intercompany debt;

s.  Dissolution of fourteen subsidiary entities;

t.  Appointment of a new Board of Directors (the "New Board"), which has assumed management of the Reorganized Debtors;

u.  Establishment of sub-committees of the New Board, including an audit committee, compensation committee, corporate governance and nominating committee, and regulatory committee;

v.  Adoption of the Long Term Incentive Plan, pursuant to which the New Board has approved the granting of (i) an aggregate number of 87,498 restricted shares of the New Common Stock as provided in the Long Term Incentive Plan, to be distributed to certain directors, (ii) an aggregate number of options to purchase 132,012 shares of the New Common Stock to be distributed to ce1 1ain directors, as provided in the Long Term Incentive Plan, and (iii) awards of restricted stock and options to purchase New Common Stock to ce1 1ain employees of FairPoint Communications, Inc. and its subsidiaries;

w.  Adoption of the FairPoint Communications, Inc. 2010 Success Bonus Plan (the "Success Bonus Plan"), pursuant to which ce1 1ain employees received cash bonuses of approximately $1.8 million;

x.  Filing of the Ninth Amended and Restated Ce1 1ificate of Incorporation of FairPoint Communications, Inc. with the Delaware Secretary of State;

y.  Adoption of the Second Amended and Restated By-Laws of FairPoint Communications, Inc.;

z.  Conducting business operations as a reorganized entity, including entry into new contracts;

    aa. Receipt of new, more favorable post-bankruptcy credit terms from trade creditors; and

    bb. Payment of certain taxes pursuant to the Plan. (Sowell Aff. in Support of FairPoint's Motion to Dismiss ¶¶ 4(a)-(bb).)

On March 2, 2011, Verizon filed an extraordinarily belated Motion to Expedite the Appeal. (Docket No. 10.) This motion was granted on March 3, 2011. (Docket No. 12.)

## DISCUSSION

### I. The Bankruptcy Court Had Subject-Matter Jurisdiction to Order the "Verizon Injunction"

Appellant contends that the bankruptcy court lacked subject matter jurisdiction to enjoin it from bringing non-derivative claims against third-parties, whether or not the claims adversely affect the FairPoint bankruptcy estate. Verizon concedes that the bankruptcy court does have subject matter jurisdiction to enjoin it from pursuing derivative claims; therefore, only non-derivative claims are at issue in this appeal.

I conclude that the bankruptcy court had subject matter jurisdiction to enter the Verizon Injunction, and so decline to vacate or reverse its order.

Subject matter jurisdiction is a matter of law, which is reviewed de novo on appeal. See In re Maxwell Newspapers, Inc., 981 F.2d 85, 89 (2d Cir. 1992).

Title 28 U.S.C. § 1334(b) grants district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Celotex Corp. v. Edwards, 514 U.S. 300 (1995). Pursuant to 28 U.S.C. § 157(a), the district courts may, in turn, refer proceedings "arising under," "arising in," or "related to" title 11 to the bankruptcy judges. The Southern District of New York has a standing order referring all cases

8

arising under title 11 to the bankruptcy court in this district. See WorldCom Network Servs., Inc. v. Al-Khatib, No. 96 Civ. 4492, 1998 WL 23254, at *2 (S.D.N.Y. Jan. 22, 1998).

The Supreme Court recognizes that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." Celotex, 514 U.S. at 308 (citing Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). However, a bankruptcy court's "related to" jurisdiction is not "limitless." Id. Also, this jurisdiction is *in rem* in nature, meaning the court has jurisdiction to determine "all claims that 'anyone, whether named in the action or not, has *to the property* or thing in question.'" In re Johns-Manville Corp., 600 F.3d 135, 152 (2d Cir. 2010) ("Manville IV") (quoting In re Millenium Seacarriers, Inc. 419 F.3d 83, 92 (2d Cir. 2005).

Section 105 of the Bankruptcy Code gives bankruptcy courts the power to issue orders "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105. In Celotex Corp. v. Edwards, 514 U.S. 300 (1995), the United States Supreme Court held that a bankruptcy court had jurisdiction under section 105 to enjoin claims against a third party who was not involved in the bankruptcy proceeding. In Celotex, the claim enjoined was derivative in nature and was directly adverse to the bankruptcy estate. Id. In affirming the injunction, the court noted that "the jurisdiction of the bankruptcy courts may extend more broadly" when a reorganization rather than a liquidation is at issue. Id. at 309.

Despite the seemingly expansive reach of Celotex, the Second Circuit has recognized that injunctions that do not "directly affect" a bankruptcy estate would exceed the bankruptcy court's subject matter jurisdiction. Manville III, 517 F.3d 52. In Manville III, the Court concluded that the bankruptcy court exceeded its jurisdiction in enjoining non-derivative third-party claims that had no effect on the *res* of the bankruptcy estate. 517 F.3d at 68. Manville had entered into an

agreement with its insurer, Travelers, to settle claims against its asbestos policies. The bankruptcy court approved the settlement, which barred all non-derivative third-party claims against Travelers and channeled them to the Manville Trust. Plaintiffs brought statutory and common law claims against Travelers, alleging the company had violated an independent duty to disclose asbestos-related information it had learned during its time as Manville's insurer. The claim was not derivative in nature. Nonetheless, Manville argued that the claims should be directed to the trust, as they represented an indirect attempt to collect against the Manville insurance policies, protected in bankruptcy. The Second Circuit disagreed, because the claims that the plaintiff was asserting were predicated on an independent duty that Travelers allegedly owed to plaintiffs – not to Manville – and so did not implicate any claim against the Manville bankruptcy estate. Manville III, 517 F.3d at 65.

While the United States Supreme Court vacated this ruling, Travelers Indemnity Company v. Bailey, 129 S. Ct. 2195, 2207 (2009), it did so on procedural grounds and expressly declined to decide "whether a bankruptcy court. . . could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing." On remand, see Manville IV, 600 F.3d at 153, the Second Circuit reaffirmed its original conclusion that the bankruptcy court "exceeded the bounds of [its] *in rem* jurisdiction. . . . [by enjoining] not only claims that [were] directed at the. . . *res* of the [bankruptcy] estate, but also non-derivative claims. . . that [sought] to impose liability [on a third-party] separately."

In this case, if the Litigation Trust sues Verizon (which will of course occur, since suing Verizon is the reason why the Litigation Trust exists), the injunction prohibits Verizon from claiming over against any third parties who would in turn have the right to sue FairPoint or any reorganized FairPoint to make them whole. The court suspects that this appeal is much ado

about nothing: at oral argument, neither side was able to identify a single potential claim to which the injunction might realistically apply. However, that is beside the point. The injunction is carefully tailored to bar only third party actions that could call on the resources of FairPoint or reorganized FairPoint to make a losing third party whole. The question is whether the Bankruptcy Court had jurisdiction to enter such an injunction.

The answer is yes.

As noted, a bankruptcy court has jurisdiction to enjoin third party non-debtor claims, but only to the extent that those claims "directly affect" the *res* of the bankruptcy estate. Manville III, 517 F.3d at 66, reaff'd, 600 F.3d 135, 153 (2010). The Second Circuit has never expressly decided – in Manville III , Manville IV, or otherwise – whether a third-party non-debtor claim that would, if successful, trigger a debtor's duty to indemnify or make contribution to that third party "*directly* affect[s] the *res* of the bankruptcy estate." The Third Circuit recently concluded that such a claim only *indirectly* affects the *res* of the bankruptcy estate, because the non-debtor would have to obtain a judgment against the third party, who then (and only then) would have a viable claim over against the debtor. In re W.R. Grace & Co., 591 F.3d 164 (3d Cir. 2009). However, Courts of Appeals in two other circuits have reached the opposite conclusion, holding that bankruptcy courts have "related to" jurisdiction to enjoin claims for indemnification or contribution arising out of third party litigation that could ultimately affect the debtor's estate and undermine the finality of the bankruptcy proceeding. In In re El Paso Refinery, LP, 302 F. 3d 343, 349 (5th Cir. 2002), the Fifth Circuit found bankruptcy court jurisdiction to enjoin third party litigation that would set off a "chain of indemnification provisions. . . leading directly to the [d]ebtor." The Sixth Circuit reached the same result in In re Wolverine Radio Co., 930 F.2d 1132, 1143 (6th Cir. 1991).

11

Prior to the issuance of the Third Circuit's decision in W.R. Grace, several of my Southern District colleagues rejected the pre-Grace Third Circuit law on which that decision is based. See e.g., N.Y. City Emps.' Ret. Sys. v. Ebbers (In re WorldCom Inc. Sec. Litig.), 293 B.R. 308, 319-20 (S.D.N.Y. 2003); Hesselman v. Arthur Anderson, LLP (In re Global Crossing, Ltd. Sec. Litig.), No. 02 Civ. 910 (GEL), 2003 WL 21659360 (S.D.N.Y. July 15, 2003); IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re Amanat), 338 B.R. 574, 580 n.5 (Bankr. S.D.N.Y. 2005). And while the issue remains undecided, the Second Circuit has at least suggested third party claims that threaten to impact a debtor's reorganization through indemnity or contribution could justify a third party litigation injunction. In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005).

I believe that the Second Circuit, if directly confronted with the question, is more likely to decide that a bankruptcy court has "related to" jurisdiction to enjoin non-debtor litigation if the bankruptcy estate may be obligated to indemnify or contribute to the losing party. Put otherwise, our Court of Appeals is likely to hold that such a contingent indemnification obligation "directly affects" the *res* of the bankruptcy estate and threatens the finality for the debtor that the bankruptcy system seeks to provide. I therefore conclude that Judge Lifland had subject matter jurisdiction to enter the Verizon Injunction – which is carefully crafted so that it is limited to actions that create contingent obligations against the estate. As the Bankruptcy Court found, the Verizon Injunction "does not broadly preclude Verizon's claims against third parties for independent wrongdoing, but precludes only those claims against parties sharing an indemnity relationship with FairPoint. . . . which will directly impact the debtors' property and

the property of the estate."[1] (Hr'g Tr. 82-83 (citing In re Dreier LLP, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010)).)

## II. Appellant's Appeal on the Basis that "Unique Circumstances" were lacking is Equitably Moot.

Alternatively, Verizon argues that the injunction is improper, because the FairPoint bankruptcy presents no unique circumstances that would justify a third-party injunction. Equitable mootness bars the court from considering this aspect of the appeal on the merits.

The Second Circuit has held that the "ability to achieve finality [in bankruptcy proceedings] is essential to the fashioning of effective remedies." Equitable mootness is a "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." In re Metromedia Fiber Network, Inc., 416 F.3d 136, 144 (2d Cir. 2005). Even when a court could conceivably fashion effective relief, an appeal should be dismissed as moot when the "implementation of that relief would be inequitable." Official Comm. Of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. Of Unsecured Creditors of LTV Steel Co., 988 F.2d 322, 325 (2d Cir. 1993) ("In re Chateaugay Corp I"). Once a Plan of Reorganization has been "substantially consummated," an appeal should be dismissed. In re Metromedia, 416 F.3d

---

[1] The Verizon Injunction also contains a judgment reduction mechanism, which appears intended to protect Verizon from any adverse impact that might arise from operation of the injunction. If the Litigation Trust gets a judgment against Verizon, and if a "court of competent jurisdiction" concludes that some third party has a duty to indemnify Verizon or to make contribution toward Verizon, then the Litigation Trust must "reduce and credit" the amount of its judgment by the amount that this "court of competent jurisdiction" determines Verizon would have obtained in any action against this unidentified third party. This is a cumbersome procedure; I have no idea what court would be "of competent jurisdiction," or what type of procedure Verizon would invoke to obtain the benefit of this judgment reduction mechanism. Furthermore, if the Bankruptcy Court were without jurisdiction to enter the injunction in the first place, the judgment reduction mechanism would not obviate that defect. But it does offer Verizon some comfort.

13

at 144; In re Chateaugay Corp. v. LTV Steel Co., Inc., 10 F.3d 944, 952-53 (2d Cir. 1993) ("In re Chateaugay Corp. II").

Pursuant to 11 U.S.C. § 1101(2), a plan is "substantially consummated" upon "[i] transfer of substantially all of the property proposed by the plan to be transferred; [ii] the reorganized debtor's assumption of the debtor's business; and [iii] commencement of distribution under the plan." In re Metromedia, 416 F.3d at 144. In In re Metromedia, the Second Circuit concluded that a plan of reorganization had been substantially consummated where the reorganized debtor had issued substantially all of its stock, had received consideration and cash distributions, and had entered into contracts, leases, and other day-to-day business arrangements. Id.

The Second Circuit has recognized that a "chief consideration" is whether appellant sought a stay of the confirmation order. Id. Where no stay was sought, "the question is not solely whether [a court] *can* provide relief without unraveling the Plan, but also whether [the court] *should* provide such relief in light of fairness concerns." Id. at 145. "A party cannot escape the obligation to protect its litigation position by so facile an argument." In re Chateaugay I, 988 F.2d at 326.

FairPoint's Plan of Reorganization has been substantially consummated. On January 24, 2011, Reorganized FairPoint took control of all FairPoint's assets and property. [Sowell Aff. ¶ 4(a).] Since then Reorganized FairPoint has issued 26 million shares of common stock and has distributed over $12.3 million in cash payment pursuant to the plan as of February 16, 2011. Id. at ¶¶ 4(b), (m). Reorganized FairPoint has also assumed over 6,900 new contracts, appointed a new board of directors, entered into collective bargaining agreements, begun conducting business operations, and filed documents with the SEC, and paid taxes required under the Plan. Id. at ¶¶ 4(p), (t), (n), (z), (l), (bb). These activities meet all three prongs set forth in 11 U.S.C.

§ 1101(2) and are far more extensive than those the Second Circuit found to constitute substantial consummation in In re Metromedia.

Verizon suggests no reason why it did not seek a stay of the Bankruptcy Court's order and the consummation of the Plan, let alone a reason that would overcome the equities of the situation as it has played out. The court certainly cannot think of any reason why Verizon should not have tried to obtain a stay. Removing the Verizon Injunction from the Plan at this point would be inequitable to Reorganized FairPoint and its creditors. Bank of America testified that the Verizon Injunction was a "key tenet" of the Plan of Reorganization. In its Findings of Fact and Conclusions of Law, the bankruptcy court found that "failure to include [the Verizon Injunction] in the Plan and the Litigation Trust Agreement would seriously impair FairPoint's ability to confirm a consensual plan. . . ." (Findings of Fact ¶¶ 18, 63, 67, Bankr. Docket No. 2112.)

Therefore, to the extent that Verizon appeals from the entry of the injunction on the merits (as opposed to because the court lacked jurisdiction to enter it), the appeal is equitably moot, and the court will not consider its arguments.

## CONCLUSION

For the foregoing reasons, the order of the Bankruptcy Court is affirmed.

This constitutes the decision and order of this Court.

Dated: April 19, 2011

U.S.D.J.


BY EMAIL TO THE HON. BURTON R. LIFLAND, U.S.B.J.

BY ECF TO ALL PARTIES

16